**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------x   Case No.
SAMELINE ALCE and DESIRÉ NUGENT,          :
on behalf of themselves and others similarly   :
situated,                                      :
                                               :
                 Plaintiffs,                   :
                                               :
                                               :
                                               :   CLASS ACTION COMPLAINT
                                               :
                                               :
              - against -                      :
                                               :
WISE FOODS, INC.                               :   JURY TRIAL DEMANDED
                                               :
                 Defendant.
----------------------------------------------------x
```

Plaintiffs SAMELINE ALCE and DESIRÉ NUGENT, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, as and for their Complaint against the Defendant, allege the following based upon personal knowledge as to themselves and their own action, and, as to all other matters, respectfully allege, upon information and belief, as follows (Plaintiffs believe that substantial evidentiary support will be uncovered for the allegations set forth herein after a reasonable opportunity for discovery):

## NATURE OF THE ACTION

1.     This is a consumer protection action arising out of deceptive and otherwise improper business practices that Defendant, WISE FOODS, INC. (hereinafter "Wise" or

"Defendant"), engages in with respect to the packaging of their Wise® potato chip products (the "Products"). The Products are sold in non-transparent aluminum bags and marketed extensively throughout the United States. They are available at numerous retail and online outlets such as Walmart, Giant Food, and Amazon.com.

2.     The Products are mass produced and sold in various standardized product lines, flavors, and quantities as follows:

| Product Line | Product Flavor | Product Sizes |
| --- | --- | --- |
| KETTLE COOKED | Jalapeño New York Deli Kettle Cooked Potato Chips | 8.5 oz. |
| | Jalapeño Kettle Cooked | 8.5 oz. |
| | Reduced Fat Sea Salt & Balsamic Vinegar Kettle Cooked | 8.5 oz. |
| | Sea Salt & Balsamic Vinegar Kettle Cooked | 8.5 oz. |
| | Reduced Fat Original Kettle Cooked Potato Chips | 8.5 oz. |
| | Reduced Fat Barbecue Kettle Cooked | 8.5 oz. |
| | Barbecue Kettle Cooked | 8.5 oz. |
| | Original Kettle Cooked Potato Chips | 8.5 oz. |
| POTATO CHIPS | Beef Barbacoa Tacos | 8.5 oz. |
| | Unsalted | 7 oz. |
| | Lightly Salted | 7 oz. |
| | Salt & Vinegar | 6.75 oz., 8.75 oz. |
| | Honey BBQ | 6.75 oz., 8.75 oz. |
| | BBQ | 6.75 oz., 8.75 oz. |
| | Onion & Garlic | 6.75 oz., 8.75 oz. |
| | Golden Original | 7 oz. |
| RIDGIES | Cheddar & Sour Cream | 4.5 oz., 6.75 oz., 8.75 oz. |
| | Sour Cream & Onion | 2.75 oz., 4.5 oz., 6.75 oz., 8.75 oz. |
| | Dill Pickle | 8.75 oz. |
| | Barbecue | 6.75 oz. |
| | All Natural | 7 oz. |

3.     Defendant manufactures, markets and sells the Products with non-functional slack-fill in violation of the Federal Food Drug & Cosmetic Act ("FDCA") Section 403(d) (21 U.S.C. 343(d)), the Code of Federal Regulations Title 21 part 100, *et. seq.*, as well as the laws prohibiting misbranded food of New York and the District of Columbia, which impose requirements identical to federal law.

4.      Slack-fill is air or filler material within a packaged product. Slack-fill that is necessary as part of the manufacturing process, is the result of contents settling during shipping, or that is necessary to protect the product is functional slack-fill and is not proscribed. Non-functional slack-fill is slack-fill that serves no legitimate purpose. "The [FDA] also finds that slack-fill in excess of that necessary to accomplish a particular function is nonfunctional slack-fill." 58 FR 64123, 64127. When consumers purchase a package of Defendants' Products, they are getting less product than they bargained for, effectively they are tricked into paying for air, because the Products contain large amounts of non-functional slack-fill.

5.      Images of the Products in various flavors are provided herein under **Exhibit A**. Regardless of the different sizes of the plastic and aluminum bags, the Products are invariably packaged in non-transparent wrappings so that Plaintiffs and Class members cannot see the slack-fill in the bag.

6.      The size of the plastic and aluminum chip bags in comparison to the volume of the Products contained therein makes it appear to Plaintiffs and Class members that they are buying more than what is actually being sold, thus deceiving them into making purchases they would not make at the given prices did they know the truth. Plaintiffs and Class members are denied the benefit of their bargain because they pay for full bags of chips (with only minimal air) but actually receive far fewer chips.

7.      For example, below is an image of a bag of Wise's® Golden Original Potato Chip Product containing 7 oz. of chips. The bag's resting dimensions are: approximately 12.5 inches in height, with about .5 inches at the top sealed shut, and 6.5 inches by width. The line indicates the approximate height of the potato chips inside, which occupy about one third of the total available space – only about 4 inches out of a total vertical capacity of approximately 12 inches

in height, i.e. about 33% of the available space, leaving about 8 inches (67% of the available

space) as slack-fill:



8.      Below is an image of how this bag appears once opened:



9.      Below is an image of a bag of Wise's® Ridgies Sour Cream and Onion potato

chip Product containing 6.75 oz. of chips. The bag's resting dimensions are: approximately 12.5

inches in height, with about .5 inches at the top sealed shut, and 6.5 inches by width. The line

indicates the approximate height of the potato chips inside, which occupy about one third of the

total available space – only about 4 inches out of a total vertical capacity of approximately 12

inches in height, i.e. about 33% of the available space, leaving about 8 inches (67% of the

available space) as slack-fill:



APPROXIMATE
LINE OF FILL

10.    Below is an image of how this bag appears once opened:



11.    While some of Defendant's slack-fill may serve the functional purpose of minimizing the breakage of chips, Defendant's total slack-fill exceeds the amount necessary for this and some of the slack-fill is therefore nonfunctional slack-fill. This is proven by the fact that the slack-fill in Defendant's Products is significantly greater than the slack-fill in the packaging of Defendant's other potato chip products and those of its competitors. including Wise's® 9.25 oz. Original Dipsy Doodles, Ruffles® 6.25 oz. Oven Baked Original Chips, and Ruffles® 8.5 oz. Sour Cream and Onion Chips. *See* **Exhibit B**. The lines indicate the approximate height of the chips inside, which in all cases cover far more than half of the total available space –far less than 50% slack-fill.

12.    Some slack-fill serves a functional purpose or exists because manufacturing equipment does not completely fill a container and leaves some air. By comparing the bags of

Defendant's Products to the bags of Defendant's other snack chip lines and the chips of its competitors, it is possible to establish that the Products contain non-functional slack-fill. Competitors' product bags that are smaller that Defendant's Product bags – yet contain the same amount of chips or more – show that it is possible to fit the same quantity of chips into a smaller bag. The surplus empty space in Defendant's Product bags over and above the space in comparison chip bags is certainly non-functional slack-fill. Likewise, when competitors fit more potato chips into the same size bag that Defendant uses, it proves that some of the empty space in Defendant's Product bags is in excess of that needed for potato chip manufacturing and shipping.

13.    In fact, competitors use bags that are *simultaneously* smaller than Defendant's Product bags *and* contain more chips than them. This is compelling proof that Defendant's bags contain non-functional slack fill, i.e. that its Product bags are oversized relative to the quantity of chips they contain. Likewise, other snack chips manufactured by Defendant, such as Wise® Original Dipsy Doodles, has far less slack fill than the Products.

14.    A bag of Wise® Original Dipsy Doodles contains 9.25 oz. of chips. The bag's resting dimensions are: approximately 10.5 inches in height, with about .5 inches at the top sealed shut, and 5.5 inches by width. The line indicates the approximate height of the potato chips inside, which occupy more than two thirds of the total available space –about 7.25 inches out of a total vertical capacity of approximately 10 inches in height, i.e. about 72.5% of the available space, leaving about 2.75 inches (27.5% of the available space) as slack-fill:



15.    All 9.25 oz. bags of Wise® Original Dipsy Doodles chips have approximately the same amount of slack-fill, demonstrating that it is possible to consistently manufacture potato chip products with less than one third slack-fill.

16.    Below is an image of how this bag appears once opened:



17.    A bag of Ruffles® Oven Baked Original contains 6.25 oz. of chips. The bag's resting dimensions are: approximately 11 inches in height, with about .5 inches at the top sealed shut, and 6 inches by width. The line indicates the approximate height of the potato chips inside, which occupy almost two thirds of the total available space –about 6.5 inches out of a total vertical capacity of approximately 10.5 inches in height, i.e. about 61% of the available space, leaving about 4 inches (38% of the available space) as slack-fill:



18.    All 6.25 oz. bags of Ruffles® Oven Baked Original chips have approximately the same amount of slack-fill, demonstrating that it is possible to consistently manufacture potato chip products with less than 40% slack-fill.

19.    Below is an image of how this bag appears once opened:



20.    A bag of Ruffles® Sour Cream and Onion contains 8.5 oz. of chips. The bag's resting dimensions are: approximately 12 inches in height, with about .5 inches at the top sealed shut, and 6.5 inches by width. The line indicates the approximate height of the potato chips inside, which occupy more than two thirds of the total available space –about 8 inches out of a total vertical capacity of approximately 11.5 inches in height, i.e. about 70% of the available space, leaving about 3.5 inches (30% of the available space) as slack-fill:



APPROXIMATE
LINE OF FILL

21.     All 8.5 oz. bags of Ruffles® Sour Cream & Onion Potato Chips have approximately the same amount of slack-fill, demonstrating that it is possible to consistently manufacture potato chip products with 30% slack-fill.

22.     Below is an image of how this bag appears once opened:



23.     The individual Ruffles® chips are comparable in size, shape, and weight to the Wise® chips. Each chip is thin, weighs approximately two grams, and is circular or ovoid with a diameter of about 1.5 inches; *see* **Exhibit C**.

24.     The Ruffles® bag is half an inch *shorter* than Defendant's 7 oz. and 6.75 oz. Product bags, but the chips inside weigh more and reach twice as high. Measurements and comparisons for the other Product sizes are in **Exhibits B** and **C**.



25.    The Wise® Original Dipsy Doodles bag is two inches s *shorter* than Defendant's 7 oz. and 6.75 oz. Product bags, but the chips inside weigh more and reach almost twice as high. Measurements and comparisons for the other Product sizes are in **Exhibits B** and **C**.

26.    Each Product bag is almost identical to every other bag selling that same weight and flavor with regards to precise bag size, chip weight, and internal fill. All 2.75 oz., 4.5 oz., 6.75 oz., 7 oz., 8.5 oz., and 8.75 oz. potato chip Product bags are standardized to have the same quantity of chips as other Product bags of that size and to be more than half full of air. Plaintiffs' Product bags were typical bags that, as Plaintiffs recollect, were less than half full of chips. Class members' Product bags were sized and filled to the common standard.

27.     A plaintiff who is sold less than what was promised by a product label has a right to recover the amount by which she overpaid. *See Lazaroff v. Paraco Gas Corp.*, 2011 NY Slip Op 52541(U), ¶ 6, 38 Misc. 3d 1217(A), 1217A, 967 N.Y.S.2d 867, 867 (Sup. Ct.) ("Plaintiff alleges that, had she understood the true amount of the product, she would not have purchased it, and that she and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of her bargain, i.e., a full 20 pound cylinder and the amount of propane she was promised. Thus, plaintiff has properly alleged injury") (quotations and citations omitted).

28.     The Products are misbranded regardless of any disclosures about contents settling and regardless of whether or not weight is labeled accurately. Under Federal regulations, "label statements cannot correct nonfunctional or misleading fill." Misleading Containers; Nonfunctional Slack-Fill, 58 Fed. Reg. 64123-01, 64129 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100).

29.     As the FDA explains in the Federal Register:

Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that accompanied the FPLA stated: "Packages have replaced the salesman. Therefore, it is urgently required that the information set forth on these packages be sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). Thus, packaging becomes the "final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container. Further, Congress stated (S. Rept. 361, supra at 9) that "Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label."

58 Fed. Reg. 64123-01, 64131 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100) (emphasis added).

30.     Courts have noted the incorporation of FDA regulations into New York law in evaluating claims brought under NY GBL § 349. *See Ackerman v. Coca-Cola Co.*, No. CV-09-

0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions").

31.    Plaintiffs and Class members viewed Defendant's misleading Product packaging, and reasonably relied in substantial part on the Product packaging's implicit representations of quantity and volume when purchasing the Products. Plaintiffs and Class members were thereby deceived into deciding to purchase the Products at a price commensurate with a full container, even though the Product containers were not full and their packaging misrepresented the quantity of chips contained therein.

32.    Plaintiffs bring this proposed consumer class action on behalf of themselves and all other persons in New York and the District of Columbia, who from the applicable limitations period up to and including the present (the "Class Period"), purchased the Products for consumption and not for resale.

33.    During the Class Period, Defendant manufactured, marketed and sold the Products throughout New York and the District of Columbia. Defendant purposefully sold the Products with non-functional slack-fill as part of a systematic practice.

34.    Defendant violated statutes enacted in New York and the District of Columbia that are designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

35.    Defendant has deceived Plaintiffs and other consumers throughout New York and the District of Columbia by misrepresenting the volume of their Products, inducing Plaintiffs and Class members to reasonably rely on Defendant's misrepresentations and purchase Products they

would not have purchased otherwise (or would not have purchased at their given purchase prices). Defendant has been unjustly enriched as a result of its conduct. Through these unfair and deceptive practices, Defendant has collected millions of dollars from the sale of their Products that they would not have otherwise earned. Plaintiffs bring this action to stop Defendant's deceptive practice.

36.    Plaintiffs expressly do not seek to contest or enforce any state law that has requirements beyond those established by federal laws or regulations.

## JURISDICTION AND VENUE

37.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

38.    Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

39.    The Court has personal jurisdiction over Defendant because its Products are advertised, marketed, distributed and sold throughout New York State.  Defendant engaged in the wrongdoing alleged in this Complaint in New York State; Defendant is authorized to do business in New York State.  Defendant has sufficient minimum contacts with New York and has intentionally availed itself of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial and not isolated activity within New York State.

40.    Venue is proper in this district pursuant to 28 U.S.C § 1391(a) and (b) because a substantial part of the events giving rise to Plaintiff ALCE's claims occurred in this District, and

Defendant is subject to personal jurisdiction in this District. Plaintiff ALCE purchased Defendant's Products in Nassau County. Moreover, Defendant distributed, advertised and sold the Products, which are the subject of the present Complaint, in this District.

## PARTIES

*Plaintiffs*

41.    Plaintiff ALCE is, and at all relevant times hereto has been, a citizen of the state of New York and resides in Bronx County. On August 23, 2016, Plaintiff ALCE purchased the 7 oz. Wise® Golden Original Potato Chips Product for personal consumption at Merrick Farms, a grocery store located in Nassau County, New York. Plaintiff ALCE purchased the Products for the premium price of $1.94, and was financially injured as a result of Defendant's deceptive conduct as alleged herein. Had because she did not receive the quantity that she paid for. Plaintiff ALCE paid to receive a bag of chips without non-functional slack-fill, but the bag Plaintiff ALCE received was less than half full of chips and contained significant non-functional slack-fill.

42.    As the result of Defendant's deceptive conduct as alleged herein, Plaintiff ALCE was injured when she paid full price for the Product but did not receive a full container without non-functional slack-fill. she paid $1.94 for the Product on the reasonable assumption that bag was filled to functional capacity. she would not have paid this sum had she known that the bag was more than half empty or had the bag been proportioned to its actual contents. Defendant promised Plaintiff ALCE a full bag of chips for $1.94, but it only delivered a partially full bag, depriving her of the benefit of her bargain. Accordingly, she was injured in the amount of the percentage of the purchase price equal to the percentage of non-functional slack-fill in the Product. Should Plaintiff ALCE encounter the Products in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging. However, Plaintiff

ALCE would still be willing to purchase the Product, as long as Defendants engage in corrective advertising, i.e. as long as she is not compelled to pay for empty space within the container when buying the Product.

43.     Wise's® competitor Ruffles® manufactures similar standardized mass-produced chips, packaging them with about 30% slack-fill. *See* **Exhibit B**, pp. 6-8. Ruffles'®  slack-fill may be partially non-functional, but the Ruffles® bag demonstrates that **at most** a bag of chips contains 30% functional slack-fill. Plaintiff ALCE paid $1.94 for a 7 oz. bag, and her bag was a typical bag that was about 33% full of chips, with slack-fill of about 67%. **At least** 37% of Plaintiff's bag (67%-30%) was non-functional slack-fill, because empty space in excess of the amount in the Ruffles® bag is demonstrably not necessary as part of the potato chip manufacturing and packaging process. **At least** 70% of Plaintiff's bag should have contained chips, but only 33% of the bag volume was filled with chips. Assuming that fully 30% of the bag is functional slack-fill,[1] Plaintiff's $1.94 should have brought her a bag 70% full of chips, and so her $1.94 was allocated between the 33% of the bag that contained chips and the 37% of the bag that is non-functional slack-fill. That is, for at least $1.02, more than one half of the money Plaintiff paid to purchase chips, she received no product: ($1.94 purchase price)*(37% non-functional slack-fill) / (37% non-functional slack-fill + 33% product) = $1.02. Plaintiff paid $1.94 for a full bag of chips, but Defendant under-filled her bag by more than half, depriving her of the benefit of her bargain.

44.     Plaintiff NUGENT is, and at all relevant times hereto has been a citizen of the District of Colombia and resides in the District of Colombia. , Plaintiff NUGENT purchased the

---

[1] Competitor Ruffles'®  product bag contains only 30% slack-fill in its 8.5 oz. bag of potato chips, demonstrating that at most 30% of the slack in Defendants' Products could be functional slack-fill, and the rest of the slack in Defendant's Products is certainly non-functional slack-fill.

6.75 oz. Wise® Honey BBQ Potato Chips Product from a Giant grocery store in the District of Colombia. NUGENT purchased the Product for the premium price of $2.00 and was financially injured as a result of Defendant's deceptive conduct as alleged herein because she did not receive the quantity that she paid for. Plaintiff NUGENT paid to receive a bag of chips without non-functional slack-fill, but the bag Plaintiff NUGENT received was less than half full of chips and contained significant non-functional slack-fill. Class members suffered similar harms.

45.    As the result of Defendant's deceptive conduct as alleged herein, Plaintiff NUGENT was injured when she paid full price for the Product but did not receive a full container without non-functional slack-fill. She paid $2.00 for the Product on the reasonable assumption that the bag was filled to functional capacity. She would not have paid this sum had she known that the bag was half empty or had the bag been proportioned to its actual contents. Defendant promised Plaintiff NUGENT a full bag of chips for $2.00, but only delivered a partially full bag, depriving her of the benefit of her bargain. Accordingly, she was injured in the amount of the percentage of the purchase price equal to the percentage of non-functional slack-fill in the Product. Should Plaintiff NUGENT encounter the Products in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging. However, Plaintiff NUGENT would still be willing to purchase the Product, as long as Defendants engage in corrective advertising, i.e. as long as she is not compelled to pay for empty space within the container when buying the Product.

46.    Wise's® competitor Ruffles® manufactures similar standardized mass-produced chips, packaging them with about 30% slack-fill. *See* **Exhibit B**, pp. 6-8, 12. Ruffles'® slack-fill may be partially non-functional, but the Ruffles® bag demonstrates that **__at most__** a bag of chips contains 30% functional slack-fill. Plaintiff ALCE paid $2.00 for a 7 oz. bag, and his bag

was a typical bag that was about 33% full of chips, with slack-fill of about 67%. **At least** 37% of Plaintiff's bag (67%-30%) was non-functional slack-fill, because empty space in excess of the amount in the Ruffles® bag is demonstrably not necessary as part of the potato chip manufacturing and packaging process. **At least** 70% of Plaintiff's bag should have contained chips, but only 33% of the bag volume was filled with chips. Assuming that fully 30% of the bag is functional slack-fill,[2] Plaintiff's $2.00 should have brought him a bag 70% full of chips, and so his $2.00 was allocated between the 33% of the bag that contained chips and the 37% of the bag that is non-functional slack-fill. That is, for at least $1.05, more than one half of the money Plaintiff paid to purchase chips, he received no product: ($2.00 purchase price)*(37% non-functional slack-fill) / (37% non-functional slack-fill + 33% product) = $1.05. Plaintiff paid $2.00 for a full bag of chips, but Defendant under-filled his bag by more than half, depriving her of the benefit of her bargain.

### *Defendant*

47.    Defendant WISE FOODS, INC. is a corporation organized under the laws of Pennsylvania with its headquarters at 228 Rasely St., Berwick, PA 18603.

48.    Defendant manufactures, markets, advertises and sells its extensive "Wise®" line of snack products throughout the United States, including the Products purchased by Plaintiffs and the Class. Defendant manufactured, packaged, distributed, advertised, marketed and sold the misbranded Products to millions of customers nationwide, including in New York, and Washington D.C. The Products are available at numerous retail and online outlets such as Walmart, Giant Food, and Amazon.com.

---

[2] Competitor Ruffles'® product bag contains only 30% slack-fill in its 8.5 oz. bag of potato chips, demonstrating that at most 30% of the slack in Defendants' Products could be functional slack-fill, and the rest of the slack in Defendant's Products is certainly non-functional slack-fill.

49.     The labeling, packaging, and advertising for the Products, relied upon by Plaintiffs, were prepared and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through advertising containing the misrepresentations alleged herein. Such labeling, packaging and advertising were designed to encourage consumers to purchase the Products and reasonably misled the reasonable consumer, i.e. Plaintiffs and the Class, into purchasing the Products. Defendant owned, marketed and distributed the Products, and created and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive labeling, packaging and advertising for the Products.

## FACTUAL ALLEGATIONS

## Identical Federal and State Law Prohibit Misbranded Foods with Non-Functional Slack-Fill

50.     Under § 403(d) of the FDCA (21 U.S.C. § 343(d)), a food shall be deemed to be misbranded "[i]f its container is so made, formed, or filled as to be misleading."

51.     The FDA has implemented § 403(d) through 21 C.F.R. § 100.100, which states:

In accordance with section 403(d) of the act, a food shall be deemed to be misbranded if its container is so made, formed, or filled as to be misleading.

(a) A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons other than:

(1) Protection of the contents of the package;

(2) The requirements of the machines used for enclosing the contents in such package;

(3) Unavoidable product settling during shipping and handling;

(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;

(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or

(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other non-mandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

52.     Food labeling law and regulations of New York and the District of Columbia impose requirements which mirror federal law.

53.     New York Agm. Law § 201 specifically provides that "[f]ood shall be deemed to be misbranded … If its container is so made, formed, colored or filled as to be misleading." Moreover, Part 259.1 of Title 1 of the New York Codes, Rules and Regulations (1 NYCRR § 259.1), incorporates by reference the regulatory requirements for food labeling under the FDCA:

> "For the purpose of the enforcement of article 17 of the Agriculture and Markets Law, and except where in conflict with the statutes of this State or with rules and regulations promulgated by the commissioner, the commissioner hereby adopts the current regulations as they appear in title 21 of the *Code of Federal Regulations* (revised as of April 1, 2013) … in the area of food packaging and labeling as follows: … (2) Part 100 of title 21 of the *Code of Federal Regulations* [21 C.F.R. 100 et seq.], containing Federal definitions and standards for food packaging and labeling *General* at pages 5-10…."

1 NYCRR § 259.1(a)(2).

54.     Courts have noted the incorporation of FDA regulations into New York law in evaluating claims brought under NY GBL § 349.  *See Ackerman v. Coca-Cola Co*., No. CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions").

55.    The requirements of 21 C.F.R. § 100.100 have also been incorporated by reference into the District of Columbia Consumer Protection Procedures Act, which prohibits "sell[ing] consumer goods in a condition or manner not consistent with that warranted by operation of sections 28:2-312 through 318 of the District of Columbia Official Code, or by operation or <u>requirement of federal law</u>." [emphasis added] D.C. Code § 28–3904(x).

**<u>Defendant's Products Contain Slack-Fill</u>**

56.    Slack-fill is the difference between the actual capacity of a container and the volume of product contained within it.

57.    Defendant's Products all contain significant slack-fill.  The measurements are in **Exhibit B**, and they show the following levels of slack-fill:

a.    Wise's® 7 oz. Bag: Approximately 67% Slack-Fill; *see* **Exhibit B**, pp. 1-8;

b.    Wise's® 6.75 oz. Bag: Approximately 67% Slack-Fill; *see* **Exhibit B**, pp. 9-12;

c.    Wise's® 2.75 oz. Bag: Approximately 75% Slack-Fill: *see* **Exhibit B**, pp. 13-19;

d.    Wise's® 4.5 oz. Bag: Approximately 62.5% Slack-Fill; *see* **Exhibit B**, pp. 20-22;

e.    Wise's® 8.5 oz. Bag: Approximately 58% Slack-Fill; *see* **Exhibit B**, pp. 23-25;

f.    Wise's® 8.75 oz. Bag: Approximately 72% Slack-Fill; *see* **Exhibit B**, pp. 26-28.

58.    This is in contrast to competitor Ruffles'®  potato chip bags, which contain only about one third slack fill. The slack in the Ruffles® bag may or may not all be functional slack, but slack in a potato chip bag in excess of 30% is certainly non-functional, as the 8.5 oz. Ruffles® Sour Cream and Onion bag demonstrates. Defendant misleads consumers into purchasing its Products because consumers believe that they are purchasing a bag containing only chips and functional slack-fill, but consumers who purchased the Products received far

fewer chips than they bargained for, as the Product bags have significant amounts of volume occupied by non-functional slack-fill instead of potato chips.

59.    It is also in contrast to Defendant's own Dipsy Doodles snack chip bags, which are almost three quarters filled with chips, with only about 27.5% slack-fill, *see* **Exhibit B, pp. 3-5**.

## Defendant's Slack-Fill is Non-Functional

60.    The FDA has defined non-functional slack-fill as any slack-fill in excess of that required to achieve the functional purposes listed in 21 C.F.R. § 100.100(a):

> FDA advises that the exceptions to the definition of "nonfunctional slack-fill" in § 100.100(a) apply to that portion of the slack-fill within a container that is necessary for, or results from, a specific function or practice, e.g., the need to protect a product. Slack-fill in excess of that necessary to accomplish a particular function is nonfunctional slack-fill. Thus, the exceptions in § 100.100(a) provide only for that amount of slack-fill that is necessary to accomplish a specific function. FDA advises that these exceptions do not exempt broad categories of food, such as gift products and convenience foods, from the requirements of section 403(d) of the act. For example, § 100.100(a)(2) recognizes that some slack-fill may be necessary to accommodate requirements of the machines used to enclose a product in its container and is therefore functional slack-fill. However, § 100.100(a)(2) does not exempt all levels of slack-fill in all mechanically packaged products from the definition of nonfunctional slack-fill.

58 FR 64123, 64126 (emphasis added)

61.    Thus, the possibility that some portion of the slack-fill in Defendant's Products may be justified as functional based on the exemptions in §100.100(a) does not justify slack-fill that is in excess of that required to serve a legitimate purpose—protecting contents, accommodating the machines that enclose the contents, accommodating settling, etc. Defendant's slack fill serves no purpose other than to mislead consumers about the quantity of food they are actually purchasing.  *See Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 405 (E.D.N.Y. 2010) ("Misleading consumers is not a valid reason to package a product with slack-fill. *See* 21 C.F.R. § 100.100(a)(1–6).").

26

62.     That Defendant's Products contain slack-fill in excess of what is permitted under § 100.100 is proven by the fact that other lines and brands of snack chips contain significantly less slack-fill.   The similarly sized bags of Defendant's competitors contain significantly less slack-fill, and thus more chips, notwithstanding factors like the need to protect package contents or accommodate machines and settling. This is documented in **Exhibit B** and summarized here below:

a.   Wise's® 7 oz. Bag (12.5 inches tall, 12 inches vertical capacity): 67% slack-fill **versus** Ruffles® 8.5 oz. Sour Cream and Onion Chips Bag (12 inches tall, 11.5 inches vertical capacity): 30% slack-fill; *see* **Exhibit B**, pp. 1-8.

b.   Wise's® 6.75 oz. Bag (12.5 inches tall, 12 inches vertical capacity): 67% slack-fill **versus** Ruffles® 8.5 oz. Sour Cream and Onion Chips Bag (12 inches tall, 11.5 inches vertical capacity): 30% slack-fill; *see* **Exhibit B**, pp. 9-12.

c.   Wise's® 2.75 oz. Bag (12.5 inches tall, 12 inches vertical capacity): 75% slack-fill **versus** Ruffles® 6.25 oz. Oven Baked Original potato chips bag (11 inches tall, 10.5 inches vertical capacity): 38% slack-fill; *see* **Exhibit B**, pp. 13-19.

d.   Wise's® 4.5 oz. Bag (12.5 inches tall, 12 inches vertical capacity): 62.5% slack-fill **versus** Ruffles® 6.25 oz. Oven Baked Original potato chips bag (11 inches tall, 10.5 inches vertical capacity): 38% slack-fill; *see* **Exhibit B**, pp. 20-22.

e.   Wise's® 8.5 oz. Bag (12.5 inches tall, 12 inches vertical capacity): 58% slack-fill **versus** Ruffles® 8.5 oz. Sour Cream and Onion Chips Bag (12 inches tall, 11.5 inches vertical capacity): 30% slack-fill; *see* **Exhibit B**, pp. 23-25.

    f.   Wise's® 8.75 oz. Bag (14 inches tall, 13.5 inches vertical capacity): 72% slack-fill **versus** Ruffles® 8.5 oz. Sour Cream and Onion Chips Bag (12 inches tall, 11.5 inches vertical capacity): 30% slack-fill; *see* **Exhibit B**, pp. 26-28.

63.    The slack-fill in Wise's® Products varies between different sized bags. But it is in every case greater than the slack-fill in the similarly sized bags of its competitor Ruffles. Whereas the latter limits their slack-fill to approximately 30% or so, Defendant's Products significantly exceed this threshold. The comparison is between the same kind of product in the same kind of packaging that is enclosed in the same way by the same kind of technology. And yet Wise's® competitor Ruffles® manage to package their chips in a way that leaves consumers with a more accurate sense of how much food they are actually purchasing. Thus, whatever real constraints <u>might</u> justify 30% slack-fill in the competitor chips cannot explain the excess slack-fill in Defendant's Products.

64.    This pattern is unambiguously demonstrated by the contrast between the 2.75 oz. and 4.5 oz. bags of Wise® Ridgies potato chips. As shown below, the bags are packaged into identically sized bags, yet 2.75 oz. bag contains far fewer chips than the 4.5 oz. bag. No manufacturing or other constraints limit Defendant from filling its 2.75 oz. bag more fully or from using a smaller bag to package 2.75 oz. of chips. Defendant's 4.5 oz. bag – which itself contains non-functional slack-fill – shows that more chips can fit comfortably within a smaller bag.



**Defendant's Non-Functional Slack-Fill is Deceptive and Misleading**

65.    The real explanation lies in Defendant's desire to mislead consumers about how much product they are actually purchasing and thus increase sales and profits.  Defendant uses non-functional slack-fill to mislead consumers into believing that they are receiving more chips than they are actually receiving.  The packaging of the Products is uniformly made out of non-transparent wrappings so that consumers cannot see the slack-fill therein, thus giving Plaintiffs and the Class the false impression that there are more chips inside than there actually is.

66.    Even if Defendant's net weight disclosures are accurate, such does not eliminate this basic deception.  The FDA has confirmed this in unequivocal terms:

> FDA disagrees with the comments that stated that net weight statements protect against misleading fill. FDA finds that <u>the presence of an accurate net weight</u>

<u>statement does not eliminate the misbranding</u> that occurs when a container is made, formed, or filled so as to be misleading.

58 FR 64123, 64128 (emphasis added).

Section 403(e) of the act requires packaged food to bear a label containing an accurate statement of the quantity of contents. This requirement is separate and in addition to section 403(d) of the act. <u>To rule that an accurate net weight statement protects against misleading fill would render the prohibition against misleading fill in section 403(d) of the act redundant</u>. In fact, Congress stated (S. Rept. No. 493, 73d Cong., 2d sess. 9 (1934)) in arriving at section 403(d) of the act that that section is "intended to reach deceptive methods of filling where the package is only partly filled and, <u>despite the declaration of quantity of contents on the label</u>, creates the impression that it contains more food than it does." Thus, Congress clearly intended that failure to comply with either section would render a food to be misbranded.

58 FR 64123, 64128-64129 (emphasis added).

67.    Independently from the text on the Product labels and regardless of its accuracy or inaccuracy, the size of the Product packaging makes a representation about the quantity of its contents. For Defendants' Products, this representation is false.

68.    While consumers may have come to expect significant slack-fill in potato chips and other snack products, this too does not eliminate Defendant's deception. The FDA has stated that "although consumers may become used to the presence of nonfunctional slack-fill in a particular product or product line, the recurrence of slack-fill over an extended period of time does not legitimize such slack-fill if it is nonfunctional." 58 FR 64123, 64131

<u>**Plaintiffs and the Class Reasonably Relied on the Size of the Products' Packaging as an Indicator of How Much Food They Were Purchasing**</u>

69.    At the point of sale, Plaintiffs and Class members did not know, and had no reason to know, that the Products contained non-functional slack-fill as set forth herein, and would not have bought the Products at the given prices had they known the truth about them.

70.    Defendant's Product packaging was a material factor in Plaintiffs' and Class members' decisions to purchase the Products and pay the advertised price for them because

reasonable consumers would attach importance to the quantity of food they believe they are purchasing.

71.     Plaintiffs and the Class reasonably relied on the size of the Products' packaging to infer how much food they were purchasing and reasonably believed that the bags were filled as closely to capacity as functionally possible. The FDA has explained why such reliance is reasonable:

> Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that accompanied the FPLA stated: "Packages have replaced the salesman. Therefore, it is urgently required that the information set forth on these packages be sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). Thus, packaging becomes the "final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container. Further, Congress stated (S. Rept. 361, supra at 9) that "Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label."

58 FR 64123, 64131 (emphasis added).

72.     Congress recognized that the size of a package is in and of itself a kind of sales pitch, even if not made with words or numbers. Thus, consumers can reasonably rely on packaging size as a representation of quantity regardless of whatever is printed on the label. And manufacturers can be held responsible for non-functional slack-fill regardless of whatever else they say.

73.     Defendant might argue that Plaintiffs and the Class should not have relied on the packaging's size to infer its contents because they could have manipulated the packaging in order to acquire a sense of the slack-fill therein (i.e., shaking the package to hear the chips rustling or poking it to feel the air). But the FDA has stated that such manipulation cannot be reasonably expected of consumers:

> FDA advises that the entire container does not need to be transparent to allow consumers to fully view its contents, i.e., a transparent lid may be sufficient depending on the conformation of the package. On the other hand, FDA finds that <u>devices, such as a window at the bottom of a package, that require consumers to manipulate the package, e.g., turning it upside down and shaking it to redistribute the contents, do not allow consumers to fully view the contents of a container.</u> FDA finds that such devices do not adequately ensure that consumers will not be misled as to the amount of product in a package. Therefore, such foods remain subject to the requirements in § 100.100(a) that slack-fill in the container be functional slack-fill.

58 FR 64123, 64128 (emphasis added).

The FDA was here contemplating a scenario in which manipulating a package might permit an accurate visual estimate of its contents. This is clearly impossible in the case of Defendant's wholly non-transparent packaging, which can only provide audial or tactile clues as to the Products' slack-fill. But the same basic principle applies: the possibility that manipulating a package might yield additional insight into its contents does not exculpate non-functional slack-fill (just as accurate net weight disclosures do not). The possibility of manipulating the package to discover the truth about it does not mitigate the false statement conveyed by the disproportionately large size of the product packaging. Likewise the existence of true label statements regarding weight and quantity (if any) do not diminish Defendant's wrongdoing in using a false and misleading packaging size.

**<u>Plaintiffs and the Class Were Injured as a Result of Defendant's Deceptive Conduct</u>**

74.    Plaintiffs and Class members were injured as the result of Defendant's deceptive conduct because they paid money for less Product than Defendant represented they would be receiving. Since they would not have agreed to this exchange had they known the truth, they were deprived of the benefit of their bargain. In order for Plaintiffs and Class members to be made whole, they must be compensated in an amount consisting in the proportion of the purchase price equal to the percentage of non-functional slack-fill in the Products, which is

equivalent to the amount of product Plaintiffs and the Class paid for that Defendant did not-deliver.

75.     *See Lazaroff v. Paraco Gas Corp.*, 2011 NY Slip Op 52541(U), ¶ 6, 38 Misc. 3d 1217(A), 1217A, 967 N.Y.S.2d 867, 867 (Sup. Ct.) ("Plaintiff alleges that, had she understood the true amount of the product, she would not have purchased it, and that she and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of her bargain, i.e., a full 20 pound cylinder and the amount of propane she was promised…Thus, plaintiff has properly alleged injury. Accordingly, the court finds that the plaintiff has stated a claim for a violation of GBL § 349."); *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK), 2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016) ("Indeed, in her Complaint, Plaintiff seeks monetary damages on the grounds that she "would not have paid the premium price she paid" to buy the Products had she "known the truth."… Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive.")

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following two Classes:

### *The New York Class*

77.     Plaintiff ALCE seeks to represent the following class:

> All persons who made retail purchases of Products during the applicable limitations period in New York, and/or such subclasses as the Court may deem appropriate; (the "New York Class").

*The District of Columbia Class*

78.    Plaintiff NUGENT seeks to represent the following class:

All persons who made retail purchases of Products during the applicable limitations period in the District of Columbia, and/or such subclasses as the Court may deem appropriate; (the "D.C. Class").

79.    The proposed Classes exclude current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned

80.    The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through the appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Classes. Other members of the Classes may be identified from records maintained by Defendant and may be notified of the pendency of this action by mail, or by advertisement, using the form of notice similar to that customarily used in class actions such as this.

81.    Plaintiffs' claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendant's wrongful conduct.

82.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes in that Plaintiffs have no interests antagonistic to those of the other members of the Classes. Plaintiffs have retained experienced and competent counsel.

83.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may

be relatively small, the expense and burden of individual litigation make it impracticable for the members of the Classes to individually seek redress for the wrongful conduct alleged herein.

84.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the common questions of law and fact to the Classes are:

i.    Whether Defendant labeled, packaged, marketed, advertised and/or sold Products to Plaintiffs and Class members, using false, misleading and/or deceptive packaging and labeling;

ii.    Whether Defendant's actions constitute violations of 21 U.S.C. § 343(d);

iii.    Whether Defendant omitted and/or misrepresented material facts in connection with the labeling, packaging, marketing, advertising and/or sale of Products;

iv.    Whether Defendant's labeling, packaging, marketing, advertising and/or selling of Products constituted an unfair, unlawful or fraudulent practice;

v.    Whether the packaging of the Products during the relevant statutory period constituted unlawful non-functional slack-fill;

vi.    Whether, and to what extent, injunctive relief should be imposed on Defendant to prevent such conduct in the future;

vii.    Whether the members of the Classes have sustained damages as a result of Defendant's wrongful conduct;

viii.    Whether Defendant purposely chose non-transparent plastic and aluminum Product bags so that Plaintiffs and Class members would not be able to see the amount of slack-fill contained in the Products;

ix.    The appropriate measure of damages and/or other relief;

35

x.   Whether Defendant has been unjustly enriched through its scheme of using false, misleading and/or deceptive labeling, packaging or misrepresentations, and;

xi.   Whether Defendant should be enjoined from continuing its unlawful practices.

85.   The membership of the Classes is readily definable, and prosecution of this action as a Class action will reduce the possibility of repetitious litigation. Plaintiffs know of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

86.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will prevent the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

87.   The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole.

88.   The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Classes predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

89.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. Additionally, individual actions may be dispositive of the interest of all members of the Classes, although certain Class members are not parties to such actions.

90.     Defendant's conduct is generally applicable to the Classes as a whole and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Classes as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION

## COUNT I

**INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)
(Brought on Behalf of the New York Class)**

91.     Plaintiff ALCE realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

92.     Plaintiff ALCE brings this claim individually and on behalf of the other members of the New York Class for an injunction for violations of New York's Deceptive Acts or Practices Law, General Business Law ("NY GBL") § 349.

93.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

94.     Under the New York Gen. Bus. Code § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 . . . claims, it was error. Justifiable reliance by the plaintiff is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

95.     The practices employed by Defendant, whereby Defendant advertised, promoted, marketed and sold its Products in packaging resulting in non-functional slack-fill are unfair, deceptive and misleading and are in violation of the NY GBL § 349. Moreover, New York State law broadly prohibits the misbranding of foods in language identical to that found in regulations promulgated pursuant to the FDCA § 403 (21 U.S.C. 343(d)). Under New York Agm. Law § 201, "[f]ood shall be deemed to be misbranded … If its container is so made, formed, colored or filled as to be misleading."

96.     The foregoing deceptive acts and practices were directed at consumers.

97.     Defendant should be enjoined from packaging its Products with non-functional slack-fill as described above pursuant to NY GBL § 349, New York Agm. Law § 201, and the FDCA, 21 U.S.C. § 343(d).

98.     Plaintiff ALCE is at risk of several types of future injury, each of which justifies the imposition of an injunction. First, Defendant has misleadingly manufactured many different sizes of Products with non-functional slack-fill, and so Plaintiff ALCE may be deceived into purchasing a slack-filled Wise® Product again (whether the exact same size and flavor as before or not), causing the same type of economic injury as enumerated in the complaint.

99.     Second, Plaintiff ALCE is no longer being able to rely on defendants' representations, regardless of whether the representations are true or false. Plaintiff ALCE knows that the Products have been packaged with grossly excessive slack fill, and that Wise's® 9.25 oz. Original Dipsy Doodles have been packaged with minimal slack fill, so she cannot rely on defendant's representations absent an injunction.

100.    Third, Plaintiff ALCE will hesitate to purchase Defendant's products even if it ceases its unlawful labeling practices and begins packaging its Products without slack-fill. If the

Products are no longer sold with non-functional slack-fill, then Plaintiff ALCE could not take advantage of those products because she has been misled into believing that the products have non-functional slack-fill:

> [S]ome courts have focused on the particular nature of the injury at issue to find standing. They have found at least two injuries sufficient to establish standing where the plaintiff is aware of the misrepresentation: absent an injunction, the plaintiff-consumer will 1) no longer be able to confidently rely on the defendant's representations (*see Ries*, 287 F.R.D. at 533), and 2) refrain from purchasing products in the future even if they in fact conform to her expectations (*see Lilly v. Jamba Juice Company*, No. 13-cv-02998-JST, 2015 U.S. Dist. LEXIS 34498, 2015 WL 1248027, at *3-5 (N.D. Cal. March 18, 2015). When a consumer discovers that a representation about a product is false, she doesn't know that another, later representation by the same manufacturer is also false. She just doesn't know whether or not it's true. A material representation injures the consumer not only when it is untrue, but also when it is unclear whether or not is true.

*Duran v. Hampton Creek*, No. 3:15-cv-05497-LB, 2016 U.S. Dist. LEXIS 41650 (N.D. Cal. Mar. 28, 2016).

101.    The Court should follow the lead of California Federal Courts and recognize that a plaintiff may be injured after she learns of a manufacturer's deception, even though she is unlikely to fall victim to the exactly the same scheme again in exactly the same manner. To hold otherwise would immunize manufacturers and render injunctive relief impossible in consumer fraud class action lawsuits – if learning of a deception removed a Plaintiff's standing to seek an injunction, then wrongdoers could violate the law with impunity, defeating the purpose of consumer protection statutes.

102.    Plaintiff ALCE, on behalf of herself and all others similarly situated, respectfully demands a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## COUNT II

## DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)
### (Brought on Behalf of the New York Class)

103.    Plaintiff ALCE realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

104.    Plaintiff ALCE brings this claim individually and on behalf of the other members of the New York Class for violations of NY GBL § 349.

105.    Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in her own name to enjoin such unlawful acts or practices, an action to recover her actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

106.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by misbranding their Products so that they appear to contain more in the packaging than is actually included.

107.    The practices employed by Defendant, whereby Defendant advertised, promoted, marketed and sold its Products in packages resulting in non-functional slack-fill are unfair, deceptive and misleading and are in violation of the NY GBL § 349, New York Agm. Law § 201 and the FDCA (21 U.S.C. § 343(d)) in that said Products are misbranded.

108.    The foregoing deceptive acts and practices were directed at consumers.

109.    Plaintiff ALCE and the other New York Class members suffered a loss as a result of Defendant's deceptive and unfair trade practices. Specifically, as a result of Defendant's

40

deceptive and unfair acts and practices, Plaintiff ALCE and the other New York Class members suffered monetary losses from the purchase of Products, i.e., receiving less than the capacity of the packaging due to (at minimum) approximately 12% to 45% non-functional slack-fill in the Products. In order for Plaintiff ALCE and New York Class members to be made whole, they must receive a refund of the purchase price of the Products equal to the percentage of non-functional slack-fill in the Products.

**COUNT III**

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §§ 350 AND 350-a(1)**
**(FALSE ADVERTISING)**
(Brought on Behalf of the New York Class)

110.    This claim is brought on behalf of Plaintiff ALCE and members of the New York Class against Defendant.

111.    Plaintiff ALCE realleges and incorporates by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

112.    Defendant has been and/or is engaged in the "conduct of...business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

113.    New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising means "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

114.    Pursuant to the FDCA as implemented through 21 C.F.R. § 100.100, package size is an affirmative representation of quantity.  Thus, the non-functional slack-fill in Defendant's Products constituted false advertising as to the quantity of chips contained therein.  Defendant caused this false advertising to be made and disseminated throughout New York.  Defendant's

false advertising was known, or through the exercise of reasonable care should have been known, by Defendant to be untrue and misleading to consumers and the New York Class.

115.    Defendant's affirmative misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Products were, and continue to be, exposed to Defendant's material misrepresentations.

116.    Defendant has violated N.Y. Gen. Bus. Law § 350 because its misrepresentations and/or omissions regarding the Products, as set forth above, were material and likely to deceive a reasonable consumer.

117.    Plaintiff ALCE and members of the New York Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising. In purchasing the Products, Plaintiff ALCE and members of the New York Class relied on the misrepresentations regarding the quantity of the Products that was actually food rather than non-functional slack-fill. Those representations were false and/or misleading because the Products contain substantial hidden non-functional slack-fill. Had the New York Class known this, they would not have purchased their Products or paid as much for them.

118.    Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff ALCE and members of the New York Class seek monetary damages (including actual, minimum, punitive, treble, and/or statutory damages), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**COUNT IV**

**VIOLATIONS OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION
PROCEDUES ACT
D.C. Code § 28-3901 et seq.
(Brought on Behalf of the D.C. Class)**

119.    Plaintiff NUGENT realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

120.    Plaintiff NUGENT brings this claim individually and on behalf of the other members of the D.C. Class for Defendant's violations of the District of Columbia's Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq*.

121.    The purpose of the CPPA is to "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices," to "promote, through effective enforcement, fair business practices throughout the community," and to "educate consumers to demand high standards and seek proper redress of grievances. D.C. Code §§ 28-3901(b)(1)-(3). The CPPA's provisions are to be "construed and applied liberally to promote its purpose." D.C. Code § 3901(c).

122.    Plaintiff NUGENT and the D.C. Class members are consumers who purchased the Products for personal, family or household purposes. Plaintiff NUGENT and the D.C. Class members are "consumers" as that term is defined in D.C. Code § 28-3901(a)(2).

123.    Products that Plaintiff NUGENT and other D.C. Class members purchased from Defendant were "goods" within the meaning of D.C. Code § 28-3901(a)(7).

124.    Defendant's actions, representations, and conduct have violated, and continue to violate, the CPPA because they extend to transactions that are intended to result, or which have resulted in, the sale of goods to consumers.

43

125.    Defendant violated federal and District of Columbia law because the Products contain non-functional slack-fill and because they are intentionally packaged to prevent the consumer from being able to fully see their contents.

126.    The District of Columbia's CPPA, D.C. Code § 28-3904(a) prohibits as an unlawful trade practice "represent[ing] that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have." By engaging in the conduct set forth herein, Defendant violated and continues to violate the CPPA, because the purpose and effect of its oversized bags is to misrepresent the quantity of chips that Plaintiff and other consumers are purchasing.

127.    D.C. Code § 28-3904(e) further prohibits "misrepresent[ing] as to a material fact which has a tendency to mislead" as an unlawful trade practice. By engaging in the conduct set forth herein, Defendant violated and continues to violate the CPPA. The size of its potato chip bags was a material consideration in Plaintiff's and other consumers' decision to purchase Defendant's Products and misled Plaintiff and the D.C. Class about the quantity of chips contained therein.

128.    D.C. Code § 28-3904(h) also prohibits as an unlawful trade practice "advertis[ing] or offer[ing] goods or services without the intent to sell them or without the intent to sell them as advertised or offered." By engaging in the conduct set forth herein, Defendant violated and continues to violate the CPPA, because the size of Defendant's potato chip bag advertises a larger quantity of chips than Defendant is actually selling.

129.    Additionally, D.C. Code § 28–3904(x) prohibits "sell[ing] consumer goods in a condition or manner not consistent with that warranted by operation of sections 28:2-312 through

318 of the District of Columbia Official Code, or by operation or requirement of federal law." Thus, any violation of 21 C.F.R. § 100.100 is also a violation of the DCCA.

130.    The violations set forth above are violations "whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904

131.    Plaintiff NUGENT and the D.C. Class members are not sophisticated experts about the corporate branding, labeling and packaging practices. Plaintiff NUGENT and the D.C. Class acted reasonably when they purchased the Products based on their belief that Defendant's representations were true and lawful.

132.    Plaintiff NUGENT and the D.C. Class suffered injuries caused by Defendant because (a) they would not have purchased the Products on the same terms absent Defendant's illegal and misleading conduct as set forth herein; and (b) the Products did not have the quantities as promised.

133.    Pursuant to D.C. Code § 28-3905(k)(1)(A), Plaintiff is entitled to recover the greater of treble damages or $1,500 per violation from Defendant.

134.    Pursuant to D.C. Code § 28-3905(k)(1)(B), Plaintiff is entitled to recover reasonable attorney's fees from Defendant.

135.    Pursuant to D.C. Code § 28-3905(k)(1)(C), Plaintiff is entitled to recover punitive damages from Defendant.

136.    Pursuant to D.C. § 28-3905(k)(1)(D), Plaintiff is entitled to seek an injunction against Defendant's continuing use of non-functional slack-fill to deceive and mislead consumers.

137.    Pursuant to D.C. Code § 28-3905(k)(1)(F), Plaintiff is entitled to any other relief which the Court deems proper.

138.    Wherefore, Plaintiff NUGENT seeks the greater of treble damages or $1500 per violation, punitive damages, injunctive relief, and any other relief that the Court deems proper for the violations of the CPPA set forth above.

### COUNT V

### UNJUST ENRICHMENT
**(Brought on Behalf of the New York and D.C. Classes**

139.    Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

140.    As a result of Defendant's deceptive, fraudulent and misleading labeling, packaging, advertising, marketing and sales of Products, Defendant was enriched, at the expense of Plaintiffs and members of the Class, through the payment of the purchase price for Defendant's Products.

141.    Plaintiffs and members of the Class conferred a benefit on Defendant through purchasing the Products, and Defendant has knowledge of this benefit and has voluntarily accepted and retained the benefits conferred on it.

142.    Defendant will be unjustly enriched if allowed to retain such funds, and each Class member is entitled to an amount equal to the amount they enriched Defendant and for which Defendant has been unjustly enriched.

143.    The focus of an unjust enrichment claim is whether the defendant was unjustly enriched. At the core of New York law are three fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution. The benefit to the defendant is not limited to

monies, and can be either a direct or an indirect benefit." *State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 222 (E.D.N.Y. 2009) (internal quotations and citations omitted).

144.    Under the circumstances, it would violate equity and good conscience to permit Defendant to retain the ill-gotten benefits that it received from Plaintiffs and others similarly situated, given that the volume of the Products purchased by Plaintiffs and the Class was not what Defendant represented it as being through the Products' packaging. It would be unjust and inequitable for Defendant to retain the benefit of selling its Products in packaging containing non-functional slack-fill without restitution to Plaintiffs and others similarly situated because Plaintiffs and the Class did not receive the full benefit of their bargain. In order for Plaintiffs and Class members to be made whole, they must receive a refund equivalent to the proportion of the purchase price of the Products equal to the percentage of non-functional slack-fill in them.

145.    In New York, unjust enrichment serves as a mechanism to reimburse defrauded consumers even when a product was purchased indirectly through a third party and there is no direct connection between the parties. (*See Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 404 (E.D.N.Y. 2010), (denying motion to dismiss unjust enrichment claim where plaintiff was not in privity with defendant); *see also Famular v. Whirlpool Corp.*, No. 16 CV 944 (VB), 2017 U.S. Dist. LEXIS 8265 (S.D.N.Y. Jan. 19, 2017) ("New York law does not require plaintiff to have conferred a direct benefit on defendant to state a claim for unjust enrichment. Rather, the law requires only that the plaintiff's relationship with a defendant not be too attenuated") (internal quotations and citations omitted);

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendant as follows:

(A)    For an Order certifying the New York and D.C. Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of their respective Classes and Plaintiffs' attorneys as Class Counsel to represent members of both Classes;

(B)    For an Order declaring that Defendant's conduct violates the statutes referenced herein;

(C)    For an Order finding in favor of Plaintiffs and members of the Class;

(D)    For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(E)    For prejudgment interest on all amounts awarded;

(F)    For an Order of restitution and all other forms of equitable monetary relief;

(G)    For injunctive relief ordering Defendant to repackage the Products without non-functional slack-fill;

(H)    For an Order awarding Plaintiffs and members of the Class their reasonable attorneys' fees and expenses and costs of suit; and

(I)    For such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a jury trial on all claims so triable.

Dated: April 4, 2017

Respectfully submitted,

/s/ C.K. Lee
By:  C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs and the Class*